# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## COLUMBUS DIVISION

| | |
|---|---|
| JAHMEL MARTIN, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>AFLAC INCORPORATED, DANIEL P. AMOS and FREDERICK J. CRAWFORD,<br><br>Defendants. | Case No. _____<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff Jahmel Martin ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's Complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by Aflac Incorporated ("Aflac" or the "Company"), as well as media and analyst reports about the Company. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all persons and entities, other than Defendants and their affiliates, who purchased or otherwise acquired Aflac common stock from February 27, 2013 through January 11, 2018, both dates inclusive ("Class

Period"), seeking to recover compensable damages caused by Defendants' violations of federal securities laws and pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Aflac is a Fortune 500 company servicing more than 50 million people worldwide. The Company is authorized to conduct insurance business in all 50 states, the District of Columbia, several U.S. territories and Japan. Aflac offers voluntary insurance policies designed to supplement traditional health insurance and protect individuals from depletion of assets and loss-of-income. Its products include insurance plans for accidents, cancer, critical illness/care, hospital indemnity, fixed-benefit dental, vision care, life and short-term disability.

3.      Defendants made false and/or misleading statements and/or failed to disclose that: (i) Aflac hired its sales associates under false promises of high compensation packages and work-life-balance; (ii) Aflac misclassified its employees as independent contractors to reduce costs associated with unemployment insurance taxes and employment benefits; (iii) Aflac manipulated its average weekly producer equivalent metric to fabricate growth; (iv) consequently, Aflac violated its Code of Conduct and corporate social responsibility standards, and (v) as a result of the foregoing, Aflac's public statements were materially false and misleading at all relevant times.

4.      On January 11, 2018, post-market, the news publication The Intercept released a report revealing undisclosed lawsuits against Aflac for exploitation of workers, manipulation of accounting, and insider trading. On this news, Aflac's stock declined from a close price of $91.69 on January 11, 2018, to a close price of $84.94 on January 12, 2018, *a drop of approximately -7.36%.*

5.      As a result of Defendants' wrongful acts and omissions, and the decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

6.      The federal claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

7.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa.). This Court has jurisdiction over each Defendant named herein because each Defendant is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice.

8.      Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b) because certain of the acts alleged herein, including the preparation and dissemination of materially false and/or misleading information, occurred in this District.

## PARTIES

9.      Plaintiff purchased Aflac's stock within the Class Period and, as a result, was damaged thereby. Plaintiff's certification evidencing his transactions is submitted herewith.

10.      Defendant Aflac Incorporated is a Georgia corporation with its principal offices located at 1932 Wynnton Road, Columbus, Georgia, 31999. The Company's common stock trades on the NYSE under the ticker symbol "AFL."

11.     Defendant Aflac Incorporated is a holding company for its U.S. wholly owned subsidiary Aflac Family Life Assurance Company of Columbus and its sister company Aflac Japan (all entities together are referenced herein as "Aflac" or the "Company").

12.     Defendant Daniel P. Amos ("Amos") has served at all relevant times as the Company's Chief Executive Officer ("CEO").

13.     Defendant Frederick J. Crawford ("Crawford") has served at all relevant times as the Company's Chief Financial Officer ("CFO").

14.     Defendants in paragraphs 12-13 are collectively referred to herein as the "Individual Defendants."

15.     Each of the Individual Defendants:

(a)     directly participated in the management of the Company;

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(d)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(e)     was aware of or was severely reckless in disregarding the fact that the false and misleading statements were being issued concerning the Company; and

(f)     approved or ratified these statements in violation of the federal securities laws.

16.     Because of the Individual Defendants' positions within the Company, they had

access to undisclosed information about Aflac's business, operations, operational trends, financial statements, markets, and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts, and reports of actual operations and performance), conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to them in connection therewith.

17.     As officers of a publicly-traded company whose securities were, and are, registered with the SEC pursuant to the federal securities laws, the Individual Defendants each had a duty to disseminate prompt, accurate, and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings, and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

18.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Aflac's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed

5

from the public and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

19.     Each of the Individual Defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Aflac's securities by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Aflac's business, operations, management and the intrinsic value of its securities, and (ii) caused Plaintiff and other stockholders to purchase Aflac's securities at artificially inflated prices.

## SUBSTANTIVE ALLEGATIONS

### A.     Background

20.     As noted above, Aflac offers voluntary insurance policies designed to supplement traditional health insurance and protect individuals from depletion of assets and loss-of-income. Its products include insurance plans for accidents, cancer, critical illness/care, hospital indemnity, fixed-benefit dental, vision care, life and short-term disability.

### B.     Material Misstatements and Omissions during the Class Period

21.     The Class Period begins on February 27, 2013, when Aflac filed a Form 10-K with the SEC announcing the Company's financial and operating results for the fourth fiscal quarter and year ended December 31, 2012 ("2012 10-K"), which was signed and certified under the Sarbanes Oxley Act of 2002 by the Individual Defendants. In the 2012 10-K, the Company stated in pertinent part:

**Distribution - U.S.**

*Our U.S. sales force comprises sales associates and brokers who are independent contractors licensed to sell accident and health insurance. Many are also licensed to sell life insurance. Sales associates and brokers are paid commissions based on first-year and renewal premiums from their sales of insurance products. In addition to receiving commissions on personal production, district, regional and state sales coordinators may also receive override commissions and incentive bonuses.* Administrative personnel in Georgia, New York, Nebraska, and South Carolina handle policyholder service functions, including issuance of policies, premium collection, payment notices and claims.

*        *        *

*At the end of 2012, our distribution network comprised more than 76,400 licensed sales associates and brokers. To enhance the recruiting of sales associates, the bonus structure for our state and regional coordinators incorporates a people development component. In addition, we hold national recruiting contests to incentivize producer recruitment*. We also partner with our field offices for recruiting workshops that focus on improving coordinator productivity by emphasizing candidate sourcing, interviewing, and contract acceptance.

(Emphasis added.)

22.    On February 27, 2014, Aflac filed a Form 10-K with the SEC announcing the Company's financial and operating results for the fourth fiscal quarter and year ended December 31, 2013 ("2013 10-K"), which was signed and certified under the Sarbanes Oxley Act of 2002 by the Individual Defendants. In the 2013 10-K, the Company stated in pertinent part:

**Distribution - U.S.**

*Our U.S. sales force comprises sales associates and brokers who are independent contractors licensed to sell accident and health insurance. Many are also licensed to sell life insurance. Sales associates and brokers are paid commissions based on first-year and renewal premiums from their sales of insurance products. In addition to receiving commissions on personal production, district, regional and state sales coordinators may also receive override commissions and incentive bonuses*. Administrative personnel in Georgia, New York, Nebraska, and South Carolina handle policyholder service functions, including issuance of policies, premium collection, payment notices and claims.

\*        \*        \*

***At the end of 2013, our distribution network comprised more than 76,300 licensed sales associates and brokers. To enhance the recruiting of sales associates, the bonus structure for our state and regional coordinators incorporates a people development component. In addition, we hold national recruiting contests to incentivize producer recruitment.*** We also partner with our field offices for recruiting workshops that focus on improving coordinator productivity by emphasizing candidate sourcing, interviewing, and contract acceptance.

(Emphasis added.)

23.    In March 2014, Aflac released its 2013 Corporate Citizenship Report ("2013 Report"). In the 2013 Report, the Company stated in pertinent part:

### Letter from Chairman and CEO Dan Amos

For three years our Corporate Citizenship Report has invoked the theme "Act Like a Duck." To the uninitiated that seems silly, but to those familiar with Aflac, "acting like a duck" is another way of capturing our corporate culture, focusing attention on doing things the Aflac way. In fact, The Aflac Way is the title of the book that we hand to every new employee when he or she first comes through our doors – enabling them to become better acquainted with our commitment to ethics and to each other. It means something to do things the Aflac way.

\*        \*        \*

***So what does it mean to act like a duck? Well, I think it means that you behave in ways that land you on Ethisphere's list of World's Most Ethical Companies for eight straight years***. It means annual recognition from Latina Style and Black Enterprise magazines. It means inclusion on the Dow Jones Sustainability Index three consecutive years. But most of all, it means holding up our end of the bargain by treating customers like family and providing the benefits they need, when they need them most and fast. Within the pages of this report we will relate the work of our great people who make it all happen. ***Because as our company founders taught us more than 50 years ago, if you take care of the employees, they will take care of the business***.

\*        \*        \*

### Duck Governance

In the top 150 of Fortune 500 companies annual revenues of $23.9 billion, ***Aflac places a high value on ethics and integrity. We call this doing business the "Aflac Way".*** In fact, whenever a new employee is on-boarded at Aflac, they are handed a bound copy of a book called The Aflac Way. ***This tome highlights and details the type of ethical behavior that is expected of an Aflac employee, reinforcing our culture and ensuring that our employees understand that ethics are non-negotiable.***

\*       \*       \*

***Our company code of conduct, available on our corporate website, is the guide by which all of our employees are trained to operate.*** We further illuminate our spirit of integrity through our internal mantra expressed in the company's Seven Commitments to Customer Service, which is provided to all of our new employees as the ultimate illustration of doing business The Aflac Way. ***This commitment to ethics, sustainability and transparency extends from the Board level to entry level***.

**What it means to our stockholders**

We create a workplace where individuals can thrive not only professionally, but personally, supported by corporate programs and a corporate culture that encourages work-family balance, education and community involvement. ***In turn, the people who work for Aflac inspire us to continually improve the value we return to our customers and stockholders, the opportunities we offer to our employees and independent agents and the contributions we make to our communities. Aflac is proud to be consistently recognized as a leader in ethics, diversity and corporate responsibility.***

**What it means to our Employees**

***We take care of our employees and independent agents so they can take care of our customers. We offer excellent benefits, competitive salaries, award-winning training, plentiful advancement opportunities, on-site childcare, college scholarships, appreciation events and service awards.*** For the sixteenth year in a row, Aflac has been named one of FORTUNE's Best Companies to Work For. ***We work hard to keep our place on that list because we want to keep our great employees and independent agents working hard for Aflac.***

(Emphasis added.)

24.     On February 26, 2015, Aflac filed a Form 10-K with the SEC announcing the

Company's financial and operating results for the fourth fiscal quarter and year ended December

31, 2014 ("2014 10-K"), which was signed and certified under the Sarbanes Oxley Act of 2002 by

the Individual Defendants. In the 2014 10-K, the Company stated in pertinent part:

> **Distribution - U.S.**
>
> *As of December 31, 2014, our U.S. sales force comprised more than 70,800 sales associates and brokers who are licensed to sell accident and health insurance. Many are also licensed to sell life insurance.*
>
> *Sales associates and brokers are independent contractors and are paid commissions based on first-year and renewal premiums from their sales of insurance products. In addition to receiving commissions on personal production, district, regional, and, until September 30, 2014, state sales coordinators may also receive override commissions and incentive bonuses.*
>
> *Beginning in the third quarter and continuing into the fourth quarter of 2014, Aflac U.S. implemented tactical initiatives centered around pay for performance providing competitive compensation to our sales hierarchy and positioning us to more effectively and consistently execute on the U.S. sales strategy across all states. These measures are designed to more effectively link sales management's success to Aflac's success*. We enhanced compensation through an incentive bonus for the first level of our sales associate management, district sales coordinators, who are primarily responsible for selling Aflac products and training new sales associates. Additionally, to better manage our state operations, we eliminated the commission-based position of state sales coordinator and introduced the new position of market director. Effective October 1, 2014, market directors are salaried employees with the opportunity to earn sales-related bonuses. We believe this position change will enhance our performance management and better align compensation with new business results.

(Emphasis added.)

      25.    In June 2015, Aflac released its 2014 Corporate Citizenship Report ("2014

Report"). In the 2014 Report, the Company stated in pertinent part:

> When Aflac was founded 60 years ago, it was founded on a bedrock of ethics, integrity, kindness and fairness. Those tenets were outlined in a simple, leather-bound book titled "The Aflac Way." Today, six decades on, every new Aflac employee receives a copy of this small but powerful book that outlines how we treat our customers, employees and the communities we serve.

*      *      *

10

Our annual revenues have grown from less than $3 billion to more than $23 billion, we employ nearly 5,000 people in the U.S, and more than 70,000 independent agents and brokers sell our products. Our workforce is diverse – women comprise about 70 percent of our staff, and more than 40 percent of our employees are minorities. We've been on Ethisphere's list of World's Most Ethical Companies since 2007 and Fortune's list of 100 Best Places to Work for 17 straight years.

\*       \*       \*

**Governance the Aflac Way**

As a Fortune 500 company (appearing in the top 150 portion of the list) with annual revenues of $23.9 billion, Aflac places a premium on ethics and integrity. We call this doing business the "Aflac Way."

**IF YOU TAKE CARE OF THE EMPLOYEES,**
**THEY WILL TAKE CARE OF THE BUSINESS**

So how do you get your employees to honor the company's pioneering, protecting and prospering ways? ***At Aflac, the secret sauce has always been in the way we treat the people who keep the business going.*** As our founders often said, "If you take care of the employees, they will take care of the business." It is a creed upon which Aflac was built, and it holds just as true today. ***That's why Aflac not only pays competitive wages for employees, but every single worker is a profit sharer earning annual bonuses based on personal and company performance. That's everyone, from the CEO down to the newly hired worker.***

(Emphasis added.)

26.     On February 25, 2016, Aflac filed a Form 10-K with the SEC announcing the Company's financial and operating results for the fourth fiscal quarter and year ended December 31, 2015 ("2015 10-K"), which was signed and certified under the Sarbanes Oxley Act of 2002 by the Individual Defendants. In the 2015 10-K, the Company stated in pertinent part:

**Distribution - U.S.**

***As of December 31, 2015, our U.S. sales force was composed of sales associates and brokers who are licensed to sell accident and health insurance. Many are also licensed to sell life insurance.***

***Sales associates and brokers are independent contractors and are paid commissions based on first-year and renewal premiums from their sales of insurance products. In addition to receiving commissions on personal***

*production, district and regional sales coordinators may also receive override commissions and incentive bonuses.*

*Beginning in the third quarter and continuing into the fourth quarter of 2014, Aflac U.S. implemented tactical initiatives centered around providing competitive compensation to our sales hierarchy and positioning us to more effectively and consistently execute on the U.S. sales strategy across all states. These measures were designed to more effectively link sales management's success to Aflac's success.* For example, we enhanced compensation through an incentive bonus for the first level of our sales management, district sales coordinators, who are primarily responsible for selling Aflac products and training new sales associates. Additionally, we eliminated the commission-based position of state sales coordinator. To better manage our state operations, we introduced the new position of market director, effective October 1, 2014. Market directors are salaried with the opportunity to earn sales-related bonuses. We believe these changes have enhanced and will continue to enhance performance management and better align compensation with new business results.

(Emphasis added.)

27.   On August 31, 2016, Aflac released its 2015 Corporate Social Responsibility Report ("2015 Report"). In the 2015 Report, the Company stated in relevant part:

Aflac governance As a Fortune 150 company with annual revenues of $20.9 billion, Aflac places a premium on ethics and integrity. We call this doing business The Aflac Way. We have high expectations of all employees – from the longest-tenured to the most recently hired – and those expectations are outlined in our company code of conduct.

*          *          *

**Recognition: Ethics, reputation and customer service**

*Aflac is committed to doing business honorably and ethically. As a result, our company has received many honors for our efforts: Aflac was named one of 2015's World's Most Ethical Companies by the Ethisphere Institute, marking nine consecutive years on the list. Aflac is the only insurance company that earned this title every year since its inception.*

*          *          *

**Doing right by our employees**

12

> *We believe our employees are the heart and soul of our company, and we do everything we can to keep them as part of our growing Aflac family. We are committed to fostering an environment that embraces integrity, respect, ethics, enjoyment and amity, which has resulted in being named as one of Fortune magazine's 100 Best Companies to Work For. This is the 18th consecutive year that we have appeared on this prestigious lis*t. In addition, Great Place to Work and Fortune have recognized Aflac as one of the 100 Best Workplaces for Millennials in the U.S. These honors make us a Fortune Blue Ribbon company and are a tribute to our founding principle that says if you treat employees right, they will take care of the business*. That's why Aflac not only pays its employees competitive wages, but everyone also shares in profits, earning annual bonuses based on personal and company performance. That's everyone – from the CEO to the newest hire.*

(Emphasis added.)

28.     On February 24, 2017, Aflac filed a Form 10-K with the SEC announcing the Company's financial and operating results for the fourth fiscal quarter and year ended December 31, 2016 ("2016 10-K"), which was signed and certified under the Sarbanes Oxley Act of 2002 by the Individual Defendants. In the 2016 10-K, the Company stated in pertinent part:

**U.S.**

> *As of December 31, 2016, our U.S. sales force was composed of sales associates and brokers who are licensed to sell accident and health insurance. Many are also licensed to sell life insurance.*

> *Sales associates and brokers are independent contractors and are paid commissions based on first-year and renewal premiums from their sales of insurance products. In addition to receiving commissions on personal production, district and regional sales coordinators may also receive override commissions and incentive bonuses.*

> *We believe that changes we made to our career and broker management infrastructure over the last 30 months are laying the foundation for expanded long-term growth opportunities.* During 2014, Aflac U.S. implemented tactical initiatives centered around providing competitive compensation to our career agent sales hierarchy and positioning us to more effectively and consistently execute on the U.S. sales strategy across all states. These measures were designed to more effectively link sales management's success to Aflac's success. For example, we enhanced compensation through an incentive bonus for the first level of our sales management, district sales coordinators, who are primarily responsible for selling Aflac products and training new sales associates.

Additionally, we eliminated the commission-based position of state sales coordinator. To better manage our state operations, we introduced the new position of market director, effective October 1, 2014. Market directors are salaried with the opportunity to earn sales-related bonuses. We believe these changes have enhanced and will continue to enhance performance management and better align compensation with new business results.

\*     \*     \*

***In 2016, our traditional U.S. sales forces included more than 9,000 U.S. associates who were actively producing business on a weekly basis. We believe that the average weekly producer equivalent metric allows our sales management to monitor progress and needs.*** In 2016, sales through employers with less than 100 workers were relatively flat. In 2017, we will continue to focus our career sales agents on selling to this segment.

(Emphasis added.)

29.     On August 31, 2017, Aflac released its 2016 Corporate Social Responsibility Report ("2016 Report"). In the 2016 Report, the Company stated in pertinent part:

***When I was a youngster, I was taught the value of helping others and doing what's right. My mother's persistent wisdom: People have a responsibility to look out for one another. I've since learned that large companies share this responsibility. It's their duty to look out for their employees, their consumers, their investors and the people with whom they share this world.*** Today, Aflac provides supplemental insurance protection to more than 50 million people in Japan and the U.S. ***In more than 60 years of business, Aflac's promise has remained constant. It extends to those who make our business successful, like agents and brokers***, as well as neighbors in the communities where we live and work.

\*     \*     \*

**GOVERNANCE: DOING GOOD IS GOOD FOR BUSINESS**

People often believe companies are successful because they're hard-driving, business-focused and attentive to the bottom line. Aflac, a Fortune 135 company with annual revenues of $22 billion, is all of those things. But there's something else you should know about us:

While sales, earnings and the number of policies in force are important to our business, how we go about achieving our goals IS IMPORTANT IN DEFINING WHO WE ARE AS A COMPANY.

14

We would be remiss to exclude intangible assets – ethics, integrity, service – that characterize what shapes the company's culture and how we conduct business. We are proud of our position as the leader in voluntary insurance sales at the worksite in the United States and celebrate the many attributes that make Aflac a hero to so many.

Aflac was founded in 1955 by principal founder John Amos and his brothers, Paul and Bill Amos, who literally invented the voluntary insurance industry when they began selling policies door to door. Their idea? To provide individuals and families with a new type of protection: lifestyle insurance. In other words, insurance that covers what major medical does not and that helps pay bills that continue to roll in when a breadwinner is sick or injured.

THE AFLAC WAY

Aflac's commitment to behaving in an ethical, trustworthy manner is best captured by our code of conduct, also known as "The Aflac Way."

(Emphasis added.)

30.     The statements in paragraphs ¶21-¶29 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Aflac hired its sales associates under false promises of high compensation packages and work-life-balance; (ii) Aflac misclassified its employees as independent contractors to reduce costs associated with unemployment insurance taxes and employment benefits; (iii) Aflac manipulated its average weekly producer equivalent metric to fabricate growth; (iv) consequently, Aflac violated its Code of Conduct and corporate social responsibility standards, and (v) as a result of the foregoing, Aflac's public statements were materially false and misleading at all relevant times.

C.    <u>**The Truth Emerges**</u>

31.    On January 11, 2018, post-market, news publication The Intercept released a report ("Intercept Report") titled "BEHIND THE DUCK: FORMER AFLAC EMPLOYEES ALLEGE FRAUD AND ABUSE IN NEARLY EVERY ASPECT OF THE COMPANY," revealing undisclosed lawsuits against Aflac for exploitation of workers, manipulation of accounting, and insider trading. The Intercept Report stated in relevant parts:

> **BEHIND THE DUCK: FORMER AFLAC EMPLOYEES ALLEGE FRAUD AND ABUSE IN NEARLY EVERY ASPECT OF THE COMPANY**
>
> <u>**THE INSURANCE FIRM**</u> *Aflac has exploited workers, manipulated its accounting, and deceived stockholders and customers, according to nine former employees. This article is based on interviews with multiple current and former employees, as well as three previously unreported lawsuits.*
>
> *The allegations contained in the lawsuits involve nearly every aspect of Aflac's business and have already led to a series of investigations by state and federal regulators. But though Aflac's top management and board of directors have known about the claims for over a year, they have not disclosed anything to stockholders in public filings with the Securities and Exchange Commission beyond generalities about unnamed pending lawsuits that they say they expect will not hurt the company's bottom line.*
>
> \*        \*        \*
>
> The allegations in the lawsuits include:
> - Recruiting thousands of employees with promises of six-figure incomes in the first year, which ultimately less than 2 percent of new hires manage to earn
> - Encouraging employees to sell policies to friends and relatives and recruit them into the company, akin to a multi-level marketing scheme
> - Widespread misclassification of employees as independent contractors, despite Aflac controlling virtually every aspect of the work experience
> - Much like at Wells Fargo, employees under pressure to meet sales goals selling policies without customer authorization or consent, illegally "bundling" policies, and issuing others to ineligible customers
> - Wage theft, where commissions rightfully owed to associates are transferred to managers
> - At least one charge of sexual harassment

- Massaging of key operational metrics to prove company growth to investors
- Earnings statement manipulation, by moving sales earned in certain weeks into different quarters to hit numbers
- Retaliation against whistleblowers

***Employees initially presented the allegations to management through official company channels in December 2016, at which point Aflac management categorically denied them. However, the company thereafter made several changes to its recruiting materials, compensation plan, and operational metrics, suggesting at least some validity to the claims — or a striking coincidence.***

\*     \*     \*

***Amos's sale triggered a <u>derivative stockholder lawsuit</u> in federal court in New York brought by the ex-employees, who happened to be stockholders because of small distributions of Aflac stock as part of their compensation. The case accuses Amos and others of insider trading while holding material, non-public information: the allegations of fraud at Aflac.***

In November, the ex-employees showed Aflac a 93-page draft of a class-action suit against the company, in an attempt to settle the dispute out of court.

\*     \*     \*

***Current and former employees allege that recruiters make outsized promises about the job.*** "There's a lot of money to be made at Aflac," says Trevor Fennell in a <u>video presentation</u> shown in informational sessions with recruits. "I think that's what people are looking for in an unstable economy." Recruits are given a "Ten-Year Income Example" at interviews. According to the handout, if recruits manage to write $266,760 in annual premiums, they could earn $125,000 in commissions in the first year, growing to $236,000 in Year 10, with another $116,000 in accumulated stock bonuses.

\*     \*     \*

***"It sounds like Aflac is treating their workers like employees while classifying them as independent contractors," said Marni von Wilpert with the Economic Policy Institute, which <u>estimates</u> that 10 to 20 percent of all employers misclassify at least one employee. The practice can save companies boatloads of money. Companies don't pay payroll or unemployment insurance taxes for independent contractors, or give them benefits like overtime pay, minimum wage, or workers' compensation. They also don't have to adhere to guidelines under the Fair Labor Standards Act or allow workers to collectively bargain.***

17

> ***Misclassification artificially reduces labor costs compared to competitors who have employees.***
>
> *      *      *
>
> ***The draft class-action complaint alleges that the typical Aflac sales agent stays for less than a year and earns on average under $10,000 in commissions — and that's before accounting for the costs they've incurred along the way.*** An internal document called the "Rule of 24" lays out the cold reality, informing coordinators that out of 24 new recruits they'll get in their offices, 14 will "never get started," another six will produce a minimal amount of business, and only four will be "keepers."
>
> *      *      *
>
> ***Recruits are essentially brought in for their contacts, hitting up friends and family to buy Aflac policies, and then rotated out, with the benefits of that new business going to the higher-ups, the costs all borne by the discarded non-employees.***
>
> ***After the former employees described the allegations to Aflac management in a December 10, 2016 Dispute Notice, the company nixed the 10-year income example, replacing it with new recruiting materials promising a more modest first-year commission of $64,000. In addition, Aflac removed the Trevor Fennell recruiting video, where he says "there is a lot of money to be made at Aflac," from its website.***

(Emphasis added.)

32.     On this news, Aflac's stock declined from a close price of $91.69 on January 11, 2018, to a close price of $84.94 on January 12, 2018, ***a drop of approximately -7.36%.***

33.     As a result of Defendants' wrongful acts and omissions, and the decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

<u>**ADDITIONAL SCIENTER ALLEGATIONS**</u>

34.     As alleged herein, Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to

18

the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Aflac, their control over, and/or receipt and/or modification of Aflac's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning Aflac, participated in the fraudulent scheme alleged herein.

## LOSS CAUSATION AND ECONOMIC LOSS

35.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the Company's stock price, and operated as a fraud or deceit on acquirers of the Company's securities. As detailed above, when the truth about Aflac's misconduct was revealed, the value of the Company's securities declined precipitously as the prior artificial inflation no longer propped up its stock price. The decline in Aflac's stock price was a direct result of the nature and extent of Defendants' fraud being revealed to investors and the market. The timing and magnitude of the securities price decline negates any inference that the loss suffered by Plaintiff and other members of the Class was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct. The economic loss, i.e., damages, suffered by Plaintiff and other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the Company's stock price and the subsequent significant decline in the value of the Company's stock price when Defendants' prior misrepresentations and other fraudulent conduct was revealed.

36.     At all relevant times, Defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by the Plaintiff and other Class members. Those statements were materially false and misleading through their failure to disclose a true and accurate picture of Aflac's business, operations and financial condition, as alleged herein. Throughout the Class Period, Defendants publicly issued materially false and misleading statements and omitted material facts necessary to make Defendants' statements not false or misleading, causing the price for Aflac's securities to be artificially inflated. Plaintiff and other Class members purchased Aflac's securities at those artificially inflated prices, causing them to suffer the damages complained of herein.

## PRESUMPTION OF RELIANCE; FRAUD-ON-THE-MARKET

37.     At all relevant times, the market for Aflac securities was an efficient market for the following reasons, among others:

    (a) Aflac's securities met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient market;

    (b) During the Class Period, Aflac's securities were actively traded, demonstrating a strong presumption of an efficient market;

    (c) As a regulated issuer, Aflac filed with the SEC periodic public reports during the Class Period;

    (d) Aflac regularly communicated with public investors via established market communication channels;

    (e) Aflac was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of brokerage firms during the Class Period. Each of these reports was publicly

available and entered the public marketplace; and

(f) Unexpected material news about Aflac was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

38.     As a result of the foregoing, the market for Aflac securities promptly digested current information regarding Aflac from all publicly available sources and reflected such information in Aflac's stock price. Under these circumstances, all purchasers of Aflac securities during the Class Period suffered similar injury through their purchase of Aflac's securities at artificially inflated prices, and a presumption of reliance applies.

39.     Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to the ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security. Here, the facts withheld are material because an investor would have considered the undisclosed facts important when deciding whether to purchase and/or sell stock in Aflac.

## NO SAFE HARBOR; INAPPLICABILITY OF BESPEAKS CAUTION DOCTRINE

40.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint.

41.     To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward-looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that

could cause actual results to differ materially from those in the purportedly forward-looking statements.

42.     Defendants are also liable for any false or misleading forward-looking statements pleaded because, at the time each such statement was made, the speaker knew the forward-looking statement was false or misleading, and the statement was authorized and/or approved by an executive officer of Aflac who knew that the statement was false. Alternatively, none of the historic or present-tense statements made by the defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## CLASS ACTION ALLEGATIONS

43.     Plaintiff brings this action on behalf of all individuals and entities who purchased or otherwise acquired Aflac securities on the public market during the Class Period and were damaged, excluding the Company, the defendants and each of their immediate family members, legal representatives, heirs, successors or assigns, and any entity in which any of the defendants have or had a controlling interest (the "Class").

44.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Aflac securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may

be identified from records maintained by Aflac or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. Upon information and belief, these stocks are held by thousands of individuals located geographically throughout the country and possibly the world. Joinder would be highly impracticable.

45.      Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by the defendants' respective wrongful conduct in violation of the federal laws complained of herein.

46.      Plaintiff has and will continue to fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

47.      Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)      whether the federal securities laws were violated by the defendants' respective acts as alleged herein;

(b)      whether the defendants acted knowingly or with deliberate recklessness in issuing false and misleading financial statements;

(c)      whether the price of Aflac's securities during the Class Period was artificially inflated because of the defendants' conduct complained of herein; and

(d)      whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

48.      A class action is superior to all other available methods for the fair and efficient

adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

### COUNT I
#### *Violation of Section 10(b) and Rule 10b-5 Against All Defendants*

49.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

50.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (1) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (2) cause Plaintiff and other members of the Class to purchase Aflac's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, each of the Defendants took the actions set forth herein.

51.     Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Aflac securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

52.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Aflac as specified herein.

53.     These Defendants employed devices, schemes, and artifices to defraud while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Aflac's value and performance and continued substantial growth, which included the making of, or participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Aflac and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of Aflac securities during the Class Period.

54.     Individual Defendants' liability arises from the following facts: (1) Individual Defendants were high-level executives at the Company during the Class Period and had control thereof; (2) each Individual Defendant, by virtue of his responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's financial condition; (3) each Individual Defendant enjoyed significant personal contact and familiarity with the other Individual Defendant and was advised of and had access to other members of the Company's management team, internal reports and other information about the Company's finances, operations, and sales at all relevant times; and (4) each Individual Defendant was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

55.     Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and

for the purpose and effect of concealing Aflac's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and misstatements of the Company's financial condition throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

56.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Aflac's securities was artificially inflated during the Class Period. Unaware of the fact that market prices of Aflac's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Aflac's securities during the Class Period at artificially high prices and were damaged thereby.

57.     At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were unaware of their falsity and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding Aflac's financial results, which was not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired Aflac's securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices that they paid.

58.     By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

59.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of the Company's securities during the Class Period.

60.     This action was filed within two years of discovery of the fraud and within five years of each plaintiff's purchases of securities giving rise to the cause of action.

## COUNT II
### *The Individual Defendants Violated Section 20(a) of the Exchange Act*

61.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

62.     The Individual Defendants acted as controlling persons of Aflac within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, agency, ownership, and contractual rights, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the day-to-day operations and decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to have been misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

63.     In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

64.     As set forth above, Aflac and the Individual Defendants each violated Section 10(b) and Rule 10b-5 promulgated thereunder, by their acts and omissions as alleged in this Complaint.

65.     By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

66.     This action was filed within two years of discovery of the fraud and within five years of each Plaintiff's purchases of securities giving rise to the cause of action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment as follows:

(a)     Determining that this action is a proper class action, certifying Plaintiff as class representative under Federal Rule of Civil Procedure 23 and Plaintiff's counsel as class counsel;

(b)     Awarding compensatory damages in favor of Plaintiff and the other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of the defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

(d)     Granting extraordinary equitable and/or injunctive relief as permitted by

law; and

(e)     Such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a jury trial.

Respectfully submitted this 9th day of February, 2018.

**LAW OFFICES OF DAVID A. BAIN, LLC**

*/s/ David A. Bain*
David A. Bain
Georgia Bar No. 032449
1230 Peachtree Street, NE
Suite 1050
Atlanta, GA  30309
Tel:  (404) 724-9990
Fax:  (404) 724-9986
dbain@bain-law.com

**LEVI & KORSINSKY, LLP**

/s/ Eduard Korsinsky
Eduard Korsinsky
30 Broad Street, 24th Floor
New York, NY 10004
Tel: (212) 363-7500
Fax: (212) 363-7171
Email:ek@zlk.com

*Attorneys for Plaintiff*